# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ryan L. Ford Contractor and     :
Flagship City Insurance Company,     :
              Petitioners     :
    :
         v.     :    No. 703 C.D. 2017
    :    Submitted: November 9, 2017
Workers' Compensation Appeal     :
Board (Petersen),     :
              Respondent     :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


*OPINION NOT REPORTED*


MEMORANDUM OPINION
BY JUDGE BROBSON            FILED: June 4, 2018


Petitioners Ryan L. Ford Contractor and Flagship City Insurance Company (collectively, Employer) petition for review of an order of the Workers' Compensation Appeal Board (Board), dated May 5, 2017. The Board affirmed the decision of a Workers' Compensation Judge (WCJ), granting the claim and review petitions filed by Steen Petersen (Claimant). For the reasons set forth herein, we affirm.

Claimant worked for Employer as a skilled craftsman, performing a variety of construction-related tasks, including carpentry, plumbing, and flooring. On October 16, 2014, Claimant sustained a work-related injury in the nature of a right knee laceration and infection. Employer accepted liability for Claimant's

work-related injury pursuant to a medical-only Notice of Temporary Compensation Payable, which was subsequently converted to a Notice of Compensation Payable. On March 23, 2015, Claimant filed: (1) a claim petition, asserting that he had sustained a right knee laceration, a right knee infection, avascular necrosis in the medial femoral condyle of his right knee, and an oblique tear of the posterior horn of the medial meniscus in his right knee, while working for Employer on October 16, 2014, and that he is disabled as of December 5, 2014; and (2) a petition to review, seeking to amend Claimant's injury description to include right knee avascular necrosis in the medial femoral condyle and a right knee oblique tear of the posterior horn of the medial meniscus.[1]

Claimant testified before the WCJ at the hearing held on May 19, 2015. At that time, Claimant explained that on October 16, 2014, he was using a reciprocating saw, also known as a sawzall, with a six-inch blade to cut out a floor joist that had fire damage. (Reproduced Record (R.R.) at 26a-28a, 47a.) Claimant explained further that as he was cutting the floor joist, the sawzall's blade pinched, jumped up, and entered his right knee. (*Id.* at 28a-29a.) After the sawzall's blade exited his knee, Claimant laid the sawzall down and noticed that his pants were torn and his knee was bleeding. (*Id.* at 29a.) Claimant stated that he stopped the bleeding using a first-aid kit provided by Employer, went back into the building and collected his tools, and then returned to the shop. (*Id.* at 29a-30a, 48a.) After he arrived at the shop, Claimant reported the incident to Employer and went home.

---

[1] On March 25, 2015, Claimant also filed a penalty petition, alleging that Employer had violated Section 406.1 of the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, added by the Act of February 8, 1972, P.L. 25, *as amended*, 77 P.S. § 717.1. The WCJ determined that no penalty was warranted, and Claimant did not appeal the WCJ's determination. As such, the WCJ's decision denying Claimant's penalty petition is not an issue in this case, and, therefore, the penalty petition will not be addressed in any further detail.

2

(*Id.* at 30a-31a.) Approximately two hours after he had arrived at home, Claimant could not walk and was experiencing pain, swelling, and stiffness in his right knee. (*Id.* at 31a.) As a result, Claimant sought treatment from Lewistown Hospital, where he underwent an x-ray, had his right knee "washed out" with a machine and immobilized, and was released. (*Id.* at 31a-32a.) Claimant explained that the day after the incident, he was in excruciating pain, so he returned to Lewistown Hospital. (*Id.* at 32a.) At the hospital, Claimant was admitted and treated by Paul R. Sensiba, M.D., who performed surgery on Claimant's right knee. (*Id.* at 32a-33a.)

Claimant testified that a couple days after the surgery, he returned to work with Employer in a light-duty capacity, performing odd jobs such as pulling numbers for a job, repairing a sink drain, and installing laminate flooring. (*Id.* at 33a-35a.) Claimant explained that the kneeling and up and down movement required to perform some of these jobs caused him to experience pain in his right knee. (*Id.* at 35a.) On November 26, 2014, Dr. Sensiba released Claimant to return to work without restrictions. (*Id.* at 34a, 50a.) Claimant stated that upon his return to full-duty work with Employer, he was required to perform a job at the Northwest Bank Building in Lewistown. (*Id.* at 39a.) When asked whether the job had any effect on his symptoms, Claimant explained: "[I]t took me three days to do a day-and-a-half job, and by the time I got done carrying those two five gallon buckets of tar across the room that night was excruciating. I just couldn't do it." (*Id.* at 40a.) Claimant explained further that when he returned to work on December 5, 2014, the Monday after he had completed the Northwest Bank Building job, Employer laid him off. (*Id.* at 40a, 44a.)

Claimant testified further that following his lay-off, he continued to treat with Dr. Sensiba. (*Id.* at 40a-41a.) Claimant explained that Dr. Sensiba

3

restricted him to sedentary duty as of January 7, 2015. (*Id.* at 41a.) Thereafter, on January 10, 2015, Claimant underwent an MRI of his right knee. (*Id.* at 42a.) Claimant explained that he continues to experience stiffness in his right knee, he has to use a cane to walk, and when he walks too far, his right knee aches and he has to sit down. (*Id.* at 43a.) He stated that he does not believe that he is capable of returning to a job in construction. (*Id.* at 44a.)

Claimant also testified that prior to the October 16, 2014 work-related incident, he did not have any physical difficulties, problems, or issues with his right or left knee. (*Id.* at 26a, 47a.) Claimant explained that he also did not seek any treatment for his knees at any time prior to the October 16, 2014 work-related incident. (*Id.* at 47a.) Claimant explained further that he had not sustained any injuries working as a self-employed carpenter in the ten years prior to working for Employer. (*Id.* at 46a.) Claimant testified that in late December 2014 or early January 2015, he was walking in the rain at home, slipped on some mud, and fell down. (*Id.* at 51a.) Claimant initially testified that he did not injure himself in the fall, but he later indicated that he did hurt his knee. (*Id.* at 51a, 56a.) Claimant stated further that he did not seek any treatment in connection with the slip and fall incident. (*Id.* at 51a.) Claimant also indicated that he was involved in a motor vehicle accident on October 23, 2014, and sustained injuries to his neck and back as a result thereof.[2] (*Id.* at 53a-54a.)

---

[2] Claimant again testified before the WCJ at the hearing held on November 17, 2015. At that time, Claimant indicated that he had not worked in any capacity since the May 19, 2015 hearing. (R.R. at 88a-89a.) Following Claimant's testimony at the November 17, 2015 hearing, the parties stipulated that Claimant had performed a flooring job on November 3, 2015, as referenced in a surveillance report prepared by Gittings Investigations and Security and the deposition testimony of William Stevens. (*Id.* at 175a.)

Claimant presented the deposition testimony of Dr. Sensiba, who is board certified in orthopedic surgery. (*Id.* at 96a.) Dr. Sensiba testified that he first treated Claimant on October 17, 2014, at Lewistown Hospital. (*Id.* at 97a.) Dr. Sensiba stated that medical professionals evaluated Claimant in the emergency room the evening before, at which time such medical professionals washed out Claimant's knee, treated Claimant with IV antibiotics, and sent Claimant home. (*Id.*) Dr. Sensiba stated further that Claimant returned to Lewistown Hospital because his symptoms—*i.e.*, pain and swelling in his right knee—had not improved. (*Id.*) Dr. Sensiba performed a physical examination, which revealed a laceration on Claimant's right leg, swelling in Claimant's right knee, and pain with range of motion and upon palpation. (*Id.*) Due to the amount of swelling in Claimant's knee, Dr. Sensiba aspirated Claimant's knee so that the fluid could be analyzed to rule out an infection. (*Id.*) Dr. Sensiba explained that the fluid that he removed from Claimant's right knee was mostly blood, which indicated that there was something traumatic going on inside the knee. (*Id.*) Dr. Sensiba explained that "you don't get as much blood as I pulled out of [Claimant's] knee without some sort of intra-articular injury happening." (*Id.* at 98a.) Dr. Sensiba explained further that even though the blade may not have penetrated all the way into the knee, something happened intra-articularly from the force of the sawzall coming down onto Claimant's knee. (*Id.* at 98a, 101a.)

Dr. Sensiba testified further that he performed surgery on Claimant's right knee because he was concerned about debris getting inside the knee joint and causing infection. (*Id.* at 97a-98a.) Even though Claimant's knee was not red or hot, Dr. Sensiba was concerned about infection, because Claimant was not responding to IV antibiotics and his knee continued to be painful and swollen.

5

(*Id.* at 98a.) Dr. Sensiba also indicated that Claimant's pain and swelling was out of proportion to what he would expect for a superficial laceration. (*Id.*) During the surgery, Dr. Sensiba explored and cleaned the laceration, repaired the tendon fascia, and performed an arthroscopy. (*Id.* at 99a.) Dr. Sensiba explained that the laceration went through the quadriceps fascia, but not the tendon or the knee joint. (*Id.* at 98a-99a, 103a.) Dr. Sensiba also evacuated a hematoma in the knee joint, cauterized active bleeding in the suprapatellar pouch, repaired tearing in the medial and lateral menisci, and performed chondroplasty on the patella. (*Id.* at 99a.) Dr. Sensiba opined that the medial and lateral meniscus tears were likely preexisting, but that they had been aggravated by the October 16, 2014 work injury. (*Id.*) Dr. Sensiba also indicated that chondromalacia of the patella can be aggravated by acute trauma. (*Id.*) Dr. Sensiba stated that following the surgery, Claimant improved, but he continued to have pain in his knee. (*Id.* at 99a-100a.) Thereafter, in December 2014, following a period of sedentary duty and light duty work, Dr. Sensiba released Claimant to return to work full duty without restrictions. (*Id.* at 99a-100a.) Dr. Sensiba explained that even though Claimant continued to experience pain, Claimant wanted to return to his pre-injury job. (*Id.* at 100a.)

Dr. Sensiba stated that he treated Claimant again on January 7, 2015. (*Id.*) At that time, Claimant reported that his condition had worsened and that he was experiencing more pain in his knee. (*Id.*) Dr. Sensiba ordered an MRI of Claimant's knee, which revealed changes in the medial meniscus and avascular necrosis in the medial femoral condyle. (*Id.*) Dr. Sensiba explained that avascular necrosis essentially means that part of Claimant's knee had died because it did not have the proper blood flow. (*Id.*) When asked whether the avascular necrosis was consistent with Claimant's October 16, 2014 work-related injury, Dr. Sensiba stated:

6

"[H]e had some traumatic injury to his knee that caused him to have fairly large bloody effusion and hemarthrosis in his knee, so I think it is, yes." (*Id.*) Based upon his visit with Claimant on January 7, 2015, Dr. Sensiba returned Claimant to sedentary duty restrictions. (*Id.*)

Dr. Sensiba opined within a reasonable degree of medical certainty that Claimant's right knee problems are related to the October 16, 2014 work injury. (*Id.*) Dr. Sensiba opined further that all of the work restrictions that he has imposed upon Claimant are also related to the October 16, 2014 work-related incident. (*Id.*) Dr. Sensiba indicated that Claimant has not fully recovered from his October 16, 2014 work injury, and he did not have any plans to release Claimant from his care in the immediate future. (*Id.*) When asked about his opinion regarding the conclusions of Barry A. Ruht, M.D., Employer's expert, that any extra-articular injury was caused by Claimant's subsequent slip in the mud and not the October 16, 2014 work-related injury, Dr. Sensiba indicated that he believed that Claimant's subsequent slip and fall occurred after he had obtained the MRI of Claimant's right knee in January 2015. (*Id.*) Dr. Sensiba further indicated that, even though the sawzall blade did not go all the way into the knee joint, the degree of bleeding inside the knee was evidence of trauma that extended into the intra-articular space. (*Id.*)

On cross-examination, Dr. Sensiba admitted that Claimant had fully recovered from and does not need any further treatment with respect to the right knee laceration. (*Id.* at 104a.) Dr. Sensiba also admitted that, during surgery, he did not discover any objective evidence of trauma to the meniscus or medial lateral gutters, an acute anterior cruciate ligament (ACL) rupture, or loose bodies.[3] (*Id.*) When

---

[3] Although asked about medial lateral gutters, Claimant's ACL, and loose bodies, those structures do not appear to be at issue in this matter.

7

questioned about the cause of the trauma to Claimant's right knee, if it was not the saw blade, Dr. Sensiba said he could speculate but did not know for sure. (*Id.*) Dr. Sensiba indicated that he did not specifically know when the subsequent slip and fall incident had occurred, but he would not disagree with Claimant's statements regarding the timing thereof. (*Id.*) Dr. Sensiba admitted that a slip and fall with a representation that the knee was hurt could have caused further injury to the knee. (*Id.* at 105a.) Dr. Sensiba also confirmed that he first diagnosed Claimant with avascular necrosis in January 2015, after he released Claimant to return to full duty work without restrictions in December 2014. (*Id.*) Dr. Sensiba indicated that when he released Claimant to return to full duty work in December 2014, Claimant continued to experience pain and swelling in his right knee. (*Id.*) Dr. Sensiba, admitted, however, that Claimant's pain and swelling had improved postoperatively. (*Id.*)

Employer presented the deposition testimony of Dr. Ruht, a board certified orthopedic surgeon. (*Id.* at 112a.) Dr. Ruht performed an independent medical examination of Claimant on June 2, 2015. (*Id.* at 114a.) As part of his independent medical examination, Dr. Ruht reviewed Claimant's medical records, obtained a history, and performed a physical examination. (*Id.* at 115a-29a.) Dr. Ruht explained that Dr. Sensiba, in his operative report, indicated that there did not appear to be any traumatic or acute injury in the region of the medial femoral condyle, which is the area that Dr. Sensiba later diagnosed to have avascular necrosis. (*Id.* at 119a, 135a-36a.) Dr. Ruht explained further that he would describe Claimant's October 16, 2014 work-related injury as a small, superficial laceration that was debrided and repaired, with bruising to the blood vessels within the knee that had caused some bleeding. (*Id.* at 120a.) Dr. Ruht also explained that

8

Dr. Sensiba's treatment notes from October 29, 2014, and November 26, 2014, evidenced normal examinations despite Claimant's subjective complaints of pain. (*Id.* at 122a-23a.) Dr. Ruht testified further that following a physical examination of Claimant on January 7, 2015, Dr. Sensiba ordered an MRI of Claimant's right knee. (*Id.* at 123a.) The MRI, which was performed on January 10, 2015, revealed, *inter alia*, avascular necrosis in the medial femoral condyle and an oblique tear of the posterior horn of the medial meniscus. (*Id.* at 124a-25a.) Dr. Ruht also stated that Claimant's physical therapy note from January 9, 2015, indicated that Claimant had slipped and fell in the mud at home on an unknown date. (*Id.* at 123a-24a.) Dr. Ruht confirmed, however, that based on the timeline, he believed that Claimant's slip and fall incident had occurred sometime prior to the MRI. (*Id.* at 124a.)

Based on his review of Claimant's medical records, the history he obtained from Claimant, and his physical examination of Claimant, Dr. Ruht opined that Claimant had sustained a laceration to his right thigh as a result of the October 16, 2014 work-related incident. (*Id.* at 129a.) Dr. Ruht opined further that Claimant had fully recovered from the laceration and would have no restrictions based upon the October 16, 2014 work-related injury. (*Id.* at 129a, 132a, 137a.) Dr. Ruht opined further that the avascular necrosis in Claimant's right knee was unrelated to Claimant's October 16, 2014 work-related injury. (*Id.* at 129a-30a, 132a-33a.) Dr. Ruht attributed the avascular necrosis to the slip and fall incident that occurred prior to January 10, 2015. (*Id.* at 125a, 130a, 134a.) Dr. Ruht explained that this conclusion was based upon: (1) the x-ray of Claimant's right knee performed on October 16, 2014, which showed no evidence of avascular necrosis; (2) the lack of fatty globules or droplets contained within the fluid obtained from the two aspirations of Claimant's right knee performed on October 17, 2014;

9

and (3) Dr. Sensiba's indication in his operative report that there did not appear to be any traumatic injury in the region of the medial femoral condyle. (*Id.* at 118a, 120a-21a, 133a-34a.) Dr. Ruht also opined that Claimant did not sustain an aggravation of any preexisting problem as a result of the October 16, 2014 work-related incident. (*Id.* at 134a-35a.)

On cross-examination, Dr. Ruht admitted that Claimant's medical records indicated that both an emergency room doctor and Dr. Sensiba aspirated a significant amount of bloody fluid from Claimant's right knee following the October 16, 2014 work-related injury. (*Id.* at 139a-41a.) Dr. Ruht also admitted that Dr. Sensiba's operative report indicated the presence of a hematoma and active bleeding in the suprapatellar pouch that required cauterization. (*Id.* at 140a, 142a-43a.) Dr. Ruht confirmed that the October 16, 2014 work-related injury caused the hematoma, the bleeding in the suprapatellar pouch, and the need for the aspiration of blood. (*Id.* at 143a-44a.) Dr. Ruht also confirmed that each of these conditions are examples of an interruption of blood flow to the area of the laceration. (*Id.* at 143a-44a.) Dr. Ruht confirmed further that other than the physical therapy note, he did not see any medical records attributing any injury to Claimant's slip and fall incident. (*Id.* at 145a.) Dr. Ruht agreed that he had no knowledge of the body part on which Claimant fell or the mechanism of injury relative to Claimant's slip and fall incident. (*Id.* at 146a.) Dr. Ruht also acknowledged that any conclusions that he made regarding the slip and fall incident were based on his supposition of what had occurred.[4] (*Id.*) On redirect, Dr. Ruht clarified that the part of Claimant's

---

[4] Employer also presented the testimony of Ryan Ford, Employer's owner, who testified regarding, *inter alia*, the particulars of Claimant's employment with Employer, Claimant's return to work under light-duty restrictions following his October 16, 2014 work-related injury, Claimant's return to full-duty work thereafter, and the particulars of Claimant's layoff from employment with Employer. (R.R. at 64a-77a.)

10

right knee where there had been an interruption in blood flow does not provide the blood supply to the medial femoral condyle. (*Id.* at 147a.) Dr. Ruht also clarified that Dr. Sensiba's operative report indicated that there was no damage to the blood supply of the medial femoral condyle as of the date of surgery. (*Id.* at 147a-48a.)

On October 21, 2016,[5] the WCJ issued a decision, granting Claimant's claim and review petitions. In so doing, the WCJ summarized the witnesses' testimony and made the following relevant credibility determinations:

9. Based upon a thorough review of the evidence and testimony of record, this Judge finds Claimant to be credible to establish the history of the incident, and the presence of knee pain and difficulties with performing the duties of his employment whether they were light-duty or full-duty. I base this assessment of Claimant's credibility in large part on my observation of his demeanor. I acknowledge that Claimant is not credible with regard to his work capacity near the close of the record because he clearly was able to work in some capacity and did so. However, I find no error in Claimant attempting to return to work. There was no evidence of a job offer after Claimant was laid off in December 2014.

10. Based upon a thorough review of the evidence and testimony of record, this Judge finds the testimony of Dr. Sensiba to be credible in large part. In so holding, I rely on the fact that Dr. Sensiba was sufficiently qualified to render an opinion regarding a knee condition, and he has been acting as a treating physician which, in this Judge's assessment, puts him in a slightly better position to assess Claimant's condition rather than Dr. Ruht, who saw the Claimant on only one occasion. The testimony of Dr. Sensiba is credible to establish that Claimant sustained a laceration to his knee, as well as an aggravation of his pre-existing lateral and

---

[5] While the WCJ's order is dated October 20, 2016, the decision was not circulated until October 21, 2016.

medial meniscus tears. Dr. Sensiba provided a clear explanation of his opinions in this regard. Further, I find it credible that Claimant has not recovered from his injury, based upon the testimony of Dr. Sensiba, who rendered an opinion within a reasonable degree of medical certainty and adequately explained his opinion. I further note that Dr. Sensiba's opinion regarding the existence of an aggravation of the meniscal tears was not directly addressed by the testimony of Dr. Ruht. Rather, he seemed to focus specifically on the avascular necrosis.

I do not accept any testimony as credible or sufficient that Claimant sustained an aggravation of any pre-existing chondromalacia of the patella. Dr. Sensiba opined that this is something that "can" be aggravated by trauma. He did not specifically state that the patella findings were aggravated by the incident. Also, Dr. Sensiba has not testified or credibly established that any alleged new tear of the posterior horn of the medial meniscus is related to the October 16, 2014 injury.

Finally, with respect to the avascular necrosis, while it is a difficult issue, this Judge feels compelled to find that the avascular necrosis in the medial condyle arose as a result of the work injury as testified to by Dr. Sensiba. While it is true that the incident involving Claimant's slip and fall may have occurred before January 9, 2015, and before the January 10, 2015 MRI, it is unclear exactly when it occurred. Further, reliance on this slip and fall by Dr. Ruht to establish that the avascular necrosis occurred as a result of same seems to be quite a stretch. There is no evidence of medical treatment for this slip and fall. There is no evidence regarding the mechanism of injury for this slip and fall. There is ample evidence of a knee injury of significance causing both swelling and bleeding on October 16, 2014. As a result, I feel compelled to find Dr. Sensiba credible to establish that the Claimant's avascular necrosis arose as a result of this work injury. Claimant has no prior knee

12

problems and Dr. Sensiba explained that there was a sufficient blow to the knee under the circumstances.

11. Based upon a thorough review of the evidence and testimony of record, this Judge finds the testimony of Dr. Ruht not credible to the extent it contradicts that of Dr. Sensiba. Dr. Ruht saw the Claimant on only one occasion and was not in as good a position to assess Claimant's condition as Dr. Sensiba. Further, the testimony of Dr. Ruht relied heavily on Dr. Sensiba's operative report, but failed to accept the opinions given by Dr. Sensiba under oath. It seems that he chose to be selective as to which opinions, testimony, or findings of Dr. Sensiba he would rely on. In addition, this Judge notes that Dr. Ruht did not directly address the issue regarding Claimant's lateral and medial meniscus tears. He found Claimant recovered from the laceration, which I can accept based upon the testimony of both witnesses, but did not address the meniscal tears that were repaired. He further did not adequately explain his reliance on the January 9, 2015 physical therapy note, which failed to explain any mechanism of injury or the significance of any impact. I cannot accept his opinions regarding Claimant's condition except for the status of the laceration itself.

(WCJ's Decision at 7-9.) Based on these credibility determinations, the WCJ concluded that Claimant met his burden of proving that his October 16, 2014 work-related injury caused him to sustain a right knee laceration, an aggravation of the pre-existing lateral and medial meniscus tears in his right knee, and the onset of avascular necrosis in his right knee and to be disabled beginning December 5, 2014, and continuing thereafter. Employer appealed to the Board, which affirmed the WCJ's decision. Employer then petitioned this Court for review.

13

On appeal,[6] Employer argues that the Board committed an error of law by affirming the WCJ's decision because the WCJ's decision is not supported by substantial evidence.[7] More specifically, Employer argues that Dr. Sensiba's testimony was equivocal and incompetent because: (1) Dr. Sensiba's opinion that Claimant sustained an aggravation of pre-existing lateral and medial meniscus tears[8] and the onset of avascular necrosis in his right knee as a result of the October 16, 2014 work-related injury is based on a mechanism of injury—*i.e.*, impact to Claimant's knee from the sawzall itself—that is not supported by the evidentiary record; and (2) Dr. Sensiba admitted that he could only speculate and was not sure what had caused intra-articular trauma to Claimant's right knee. Employer argues further that even assuming that Dr. Sensiba's testimony is unequivocal and competent, the WCJ's opinion is not supported by substantial evidence.

In response, Claimant argues that Employer is essentially asking this Court to reweigh the evidence and overturn the WCJ's credibility determinations on

---

[6] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

[7] In its brief, Employer presented three issues for our consideration, all of which relate to whether the WCJ's decision to expand Claimant's injury description to include an aggravation of pre-existing lateral and medial meniscus tears and the onset of avascular necrosis in Claimant's right knee is supported by substantial evidence. Because all of Employer's arguments are interrelated, we will address them together.

[8] While Employer appears to challenge the WCJ's determination with respect to the finding that Claimant had sustained an aggravation of preexisting tears to the lateral and medial menisci, Dr. Ruht's testimony and Employer's brief focus on whether there is substantial evidence of record to support the WCJ's finding that Claimant sustained avascular necrosis in his right knee as a result of the October 16, 2014 work-related incident. For these reasons, the remainder of this opinion will only address the avascular necrosis injury.

14

appeal. More specifically, Claimant argues that Dr. Sensiba's testimony as a whole "is clear and unequivocal in establishing causation between the work injury and Claimant's ongoing disability[] and, therefore, is sufficient to support" the WCJ's decision. (Claimant's Br. at 14.) Claimant argues further that the trauma to Claimant's right knee occurred when the "reciprocating saw blade punctured Claimant's leg directly above his knee," and, therefore, "Dr. Sensiba did not 'speculate' an additional trauma to Claimant's knee." (Claimant's Br. at 20-21.) Claimant also argues that even if Dr. Sensiba had expressed uncertainty regarding the trauma to Claimant's right knee, his opinion was still unequivocal because he "maintained throughout his testimony that Claimant's avascular necrosis is the result of the October 16, 2014 work injury [and a]ny expression of uncertainty regarding the medical details would go to the credibility of [his] opinion, not his competency." (Claimant's Br. at 22.)

At the outset, we note that it is well settled that the WCJ is the sole arbiter of credibility and evidentiary weight. *Womack v. Workers' Comp. Appeal Bd. (Sch. Dist. of Phila.)*, 83 A.3d 1139, 1154 (Pa. Cmwlth.), *appeal denied*, 94 A.3d 1011 (Pa. 2014). In determining whether the WCJ's findings are supported by substantial evidence, we may not reweigh the evidence or the credibility of the witnesses but must simply determine whether the WCJ's findings have the requisite measure of support in the record as a whole. *Elk Mountain Ski Resort, Inc. v. Workers' Comp. Appeal Bd. (Tietz, deceased)*, 114 A.3d 27, 32 n.5 (Pa. Cmwlth. 2015). It is irrelevant whether there is evidence to support a contrary finding; if substantial evidence supports the WCJ's necessary findings, we may not disturb those findings on appeal. *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 143-44 (Pa. Cmwlth. 2004).

15

It is also well settled that with respect to a claim petition, the claimant bears the burden of proving all elements necessary for an award. *Inglis House v. Workmen's Comp. Appeal Bd. (Reedy)*, 634 A.2d 592, 595 (Pa. 1993). Pursuant to Section 301(c)(1) of the Workers' Compensation Act,[9] an employee's injuries are compensable if they "(1) arise[] in the course of employment and (2) [are] causally related thereto." *ICT Group v. Workers' Comp. Appeal Bd. (Churchray-Woytunick)*, 995 A.2d 927, 930 (Pa. Cmwlth. 2010). Further, an employee must demonstrate that he is disabled as a consequence of the work-related injury. *Cromie v. Workmen's Comp. Appeal Bd. (Anchor Hocking Corp.)*, 600 A.2d 677, 679 (Pa. Cmwlth. 1991). Unequivocal medical evidence is required where it is not obvious that an injury is causally related to the work incident. *Id.* "The question of whether expert medical testimony is unequivocal, and, thus, competent evidence to support factual determinations is a question of law subject to our review." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012). "In such cases, we review the testimony as a whole and may not base our analysis on a few words taken out of context." *Id.* "Taking a medical expert's testimony as a whole, it will be found to be equivocal if it is based only upon possibilities, is vague, and leaves doubt." *Kurtz v. Workers' Comp. Appeal Bd. (Waynesburg College)*, 794 A.2d 443, 449 (Pa. Cmwlth. 2002). "[M]edical testimony is unequivocal if a medical expert testifies, after providing a foundation for the testimony, that, in his professional opinion, he believes or thinks a fact exists." *O'Neill v. Workers' Comp. Appeal Bd. (News Corp., Ltd.)*, 29 A.3d 50, 57 (Pa. Cmwlth. 2011).

In addition to this requirement that a medical expert's testimony be unequivocal, the medical expert's testimony also must reflect the expert's adequate

---

[9] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 411(1).

understanding of the facts to be competent. *Sears, Roebuck & Co. v. Workmen's Comp. Appeal Bd.*, 409 A.2d 486, 490 (Pa. Cmwlth. 1979). In reviewing an expert's testimony on this basis, we must consider whether the expert "had sufficient facts before him upon which to express" his medical opinion. *Id*. A medical expert's opinion will be held to be incompetent only when the opinion is based solely on inaccurate or false information; when the record as a whole contains factual support for an expert's opinion, the opinion is not incompetent. *Am. Contracting Enters., Inc. v. Workers' Comp. Appeal Bd. (Hurley)*, 789 A.2d 391, 396 (Pa. Cmwlth. 2001). Furthermore, answers given during cross-examination in a workers' compensation proceeding "do not, as a matter of law, destroy the effectiveness of [the] previous opinions expressed by a physician." *Hannigan v. Workmen's Comp. Appeal Bd. (Asplundh Tree Expert Co.)*, 616 A.2d 764, 767 (Pa. Cmwlth. 1992), *appeal denied*, 634 A.2d 1118 (Pa. 1993). Instead, such statements go to the weight, not the competency, of the expert's opinion. *Corcoran v. Workers' Comp. Appeal Bd. (Capital Cities/Times Leader)*, 725 A.2d 868, 872 (Pa. Cmwlth. 1999).

Here, Employer contends that Dr. Sensiba's opinion regarding the cause of the avascular necrosis in Claimant's right knee is equivocal and incompetent, because the record does not contain any evidence of a specific blow or impact to Claimant's right knee from the sawzall itself, other than the sawzall blade, and Dr. Sensiba admitted that he could only speculate and was not sure what had caused the trauma to Claimant's right knee. We disagree. First, Dr. Sensiba's opinion on causation is based on a traumatic injury to Claimant's right knee, which is supported by the record. Dr. Sensiba testified that, even though the sawzall blade may not have penetrated all the way into the knee, the degree of bleeding inside the knee was evidence of intra-articular trauma from the force of the sawzall coming

17

down onto Claimant's knee. (R.R. at 98a, 100a-01a.) Employer's suggestion that the penetration of the sawzall blade into Claimant's knee was not of sufficient force to cause trauma to Claimant's right knee is just that, a suggestion. Claimant testified that he was using a sawzall to cut out a fire-damaged floor joist, when the sawzall's blade pinched, jumped up, and entered his right knee. (*Id.* at 26a-28a.) The sawzall blade had to have contacted Claimant's knee with some measure of force for it to have penetrated into Claimant's knee. Thus, Claimant's description of the October 16, 2014 work injury provides the necessary factual support in the record for Dr. Sensiba's opinion regarding the causal connection between the October 16, 2014 work-related incident and the avascular necrosis in Claimant's right knee.

Second, when taken as a whole, Dr. Sensiba's testimony on causation is not speculative. In an attempt to demonstrate the speculative nature of Dr. Sensiba's opinion, Employer directs our attention to a single exchange between Employer's counsel and Dr. Sensiba during cross-examination:

> Q. And you believe there was some kind of trauma to his knee, but you're not exactly sure what specifically caused that, if it wasn't the blade, correct?
>
> A. I can speculate.
>
> Q. But you're not sure, right?
>
> A. But I'm not sure.

(*Id.* at 104a.) This single exchange during cross-examination does not destroy the effectiveness of Dr. Sensiba's overall opinion. *See Hannigan*, 616 A.2d at 767. If we were to conclude otherwise, we would be taking a few of Dr. Sensiba's words out of context and not considering Dr. Sensiba's testimony as a whole. *See Amandeo*, 37 A.3d at 80. In addition, Employer's counsel's question asks Dr. Sensiba to speculate as to a potential cause of the trauma to Claimant's right

18

knee "*if it wasn't the blade*." In other words, Employer's counsel asked Dr. Sensiba to speculate not about the cause attributed by Dr. Sensiba—*i.e.*, the force of the sawzall blade entering Claimant's right knee—but rather, a potential alternative cause. For these reasons, Dr. Sensiba's testimony is unequivocal and competent.

Employer also contends that even assuming that Dr. Sensiba's testimony is unequivocal and competent, the WCJ's decision that Claimant sustained avascular necrosis in his right knee as a result of the October 16, 2014 work-related incident is not supported by substantial evidence because: (1) Dr. Sensiba did not diagnose Claimant with the onset of avascular necrosis until after Claimant recovered from the right knee laceration, was released to return to full-duty work, was laid off by Employer, and slipped and fell and sustained a non-work related injury to his right knee; (2) the WCJ ignored the existence, timing, and significance of Claimant's slip and fall injury to his right knee; (3) Claimant's current symptoms and complaints are related to the onset of avascular necrosis, not the right knee laceration, and Claimant recovered from the right knee laceration and was released to return to full-duty work as of November 26, 2014; (4) Dr. Ruht provided the only credible and competent expert opinion in this matter; and (5) Claimant provided false testimony to the WCJ regarding work that he performed. In making this argument, Employer is essentially asking this Court to reweigh the evidence and reconsider the WCJ's credibility determinations, which we will not do.

Dr. Ruht opined that the avascular necrosis in Claimant's right knee was unrelated to Claimant's October 16, 2014 work-related injury. Dr. Ruht attributed the avascular necrosis to Claimant's slip and fall incident. Dr. Sensiba, on the other hand, opined that the avascular necrosis in Claimant's right knee is related to and was caused by the October 16, 2014 work-related incident. The WCJ

19

credited Dr. Sensiba's testimony over Dr. Ruht's testimony on the basis that Dr. Sensiba "was sufficiently qualified to render an opinion regarding a knee condition" and had been acting as Claimant's treating physician, whereas Dr. Ruht had treated Claimant on only one occasion. (WCJ's Decision at 8.) In addition, the WCJ found that Dr. Ruht's reliance on the slip and fall incident as the cause of Claimant's avascular necrosis was a stretch. The WCJ noted that even though the slip and fall incident may have occurred before the January 10, 2015 MRI of Claimant's right knee, there was no evidence regarding the mechanism of injury for such slip and fall incident or that Claimant had sought medical treatment as a result of such slip and fall incident. (*Id.*) The WCJ, as the ultimate fact-finder, had the discretion to credit Dr. Sensiba's testimony over Dr. Ruht's testimony. As set forth more fully above, Dr. Sensiba's testimony supports the WCJ's determination that Claimant had sustained an aggravation of his preexisting lateral and medial meniscus tears and avascular necrosis in his right knee.

For all of the above-stated reasons, the WCJ's determination that the avascular necrosis in Claimant's right knee was caused by the October 16, 2014 work injury is supported by substantial evidence, and, therefore, the Board did not commit an error of law in affirming the WCJ's decision. Accordingly, we affirm the Board's order.

P. KEVIN BROBSON, Judge

20

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ryan L. Ford Contractor and      :
Flagship City Insurance Company,      :
                Petitioners      :
                            :
           v.                 :    No. 703 C.D. 2017
                            :
Workers' Compensation Appeal      :
Board (Petersen),      :
                Respondent      :

# **O R D E R**

AND NOW, this 4th day of June, 2018, the order of the Workers'
Compensation Appeal Board is hereby AFFIRMED.


                            _____

                            P. KEVIN BROBSON, Judge